UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 20-267 (SRC) |
| v. | : |  |
| MATTHEW PEOPLES | : | OPINION |

**CHESLER**, District Judge

This matter comes before the Court upon the motion filed by Defendant Matthew Peoples ("Defendant") on November 19, 2020. Defendant is charged in a one-count Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant moves to suppress evidence of the firearm discovered on October 3, 2019 in an allegedly unconstitutional search of the home in which it was found, and to suppress the written statement that Defendant furnished to the authorities shortly after the firearm was discovered. The United States of America (the "Government") opposes People's motion in its entirety.

For the reasons set forth below, the Court will deny Defendant's motion to suppress the evidence of the firearm and an evidentiary hearing will be held concerning the circumstances surrounding Defendant's written statement.

According to the police report and other documents submitted by the Government,[1] on the morning of October 3, 2019, seven law enforcement officers, including Special Agents ("S/A")

---

[1] When ruling on the admissibility of evidence, a court is not bound by the federal rules of evidence and may rely upon hearsay and other reliable evidence. See Fed.R.Evid. 1101(d)(1); 104(a); Bourjaily v. United States, 483 U.S. 171, 177–78 (1987); e.g. United States v. Demosthene, 326 F. Supp. 2d 531, 534–36 (S.D.N.Y. 2004) (relying upon police reports while considering the admissibility of evidence); United

1

and Task Force Officers ("TFO") from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and local law enforcement, arrived at the first-floor unit of an apartment complex located at 200 Harrison Street (the "Residence") during an ATF operation concerning the Paterson, New Jersey-based 230 Boys street gang (the "230 Boys"). (D.E. 40 Ex. A ("Pol. Rep.") ¶ 1.) Upon arriving, S/A Greg Sheridan, accompanied by two other officers, knocked on the front door of the Residence. (Pol. Rep. ¶ 3.) A woman ("Individual 1") opened the door and allowed the three officers to enter the apartment. (Pol. Rep. ¶ 3.) S/A Sheridan explained to Individual 1 that law enforcement was executing arrest warrants across Paterson for known members of the 230 Boys and asked for her consent to search the Residence. (Pol. Rep. ¶ 3.) Individual 1 stated that she was not comfortable providing consent because her mother, Rosheima James ("James"), owned the Residence. (Pol. Rep. ¶ 3.) At S/A Sheridan's instruction, Individual 1 called James and informed her of the law enforcement presence at the Residence. (Pol. Rep. ¶ 4.) S/A Sheridan then asked to speak to James and Individual 1 complied by handing him the cell phone. (Pol. Rep. ¶ 4.) S/A Sheridan again conveyed, this time to James, that law enforcement was executing arrest warrants across Paterson for known members of the 230 Boys and requested James' consent to search the Residence. (Pol. Rep. ¶ 4.) James verbally consented to the search and told S/A Sheridan that she was in transit to the Residence. (Pol. Rep. ¶ 4.)

Having received James' verbal consent, the investigators began searching the three-bedroom Residence. (Pol. Rep. ¶ 4.) TFO David Sheridan and Bergen County Sheriffs Officer

---

States v. Ruggiero, 824 F. Supp. 379, 391 (S.D.N.Y. 1993) ("In order to raise a factual issue concerning the validity of a seizure such that a hearing is required, the defendant must support his claim with an affidavit based on personal knowledge.").

Thomas Infusino approached the rear bedroom and discovered that the door was locked.[2] (Pol. Rep. ¶ 5.)

According to the police report, the investigators announced their presence and knocked on the door to the rear bedroom. (Pol. Rep. ¶ 5.) After several minutes of knocking, Defendant opened the door, identified himself as James' brother, and informed the officers that he stayed with James in the rear bedroom. (Pol. Rep. ¶ 5.) TFO Sheridan informed Defendant that James had consented to law enforcement's search of the Residence, after which Defendant complied and verbally consented to a search of the rear bedroom. (Pol. Rep. ¶ 5.) Defendant was then moved to the front of the Residence, along with the other occupants. (Pol. Rep. ¶ 5.)

The police report further states that, upon entering the rear bedroom, investigators immediately identified a small grey digital scale next to a small stamp, which they understood to be paraphernalia commonly used for the packaging and resale of heroin. (Pol. Rep. ¶ 9.) The investigators then identified several "bricks" of suspected heroin in a bag adjacent to the bathroom in the rear bedroom. (Pol. Rep. ¶ 9.) The investigators asked James if additional narcotics or firearms were within the rear bedroom, and James responded that there may be additional cocaine and a firearm. (Pol. Rep. ¶ 9.) S/A Joseph Sente then asked Defendant to come into the rear bedroom and drew Defendant's attention to the narcotics that the investigators had already found in the room. (Pol. Rep. ¶ 9.) TFO Sheridan asked whether Defendant would speak with them about

---

[2] During their search of the Residence, the investigators searched the two other bedrooms in the Residence. (Pol. Rep. ¶ 6.) They located narcotics and narcotics-related paraphernalia in one of these bedrooms, while they did not find narcotics or weapons in the other. (Pol. Rep. ¶¶ 7–8.) At some point during the investigators' search of the Residence, James arrived at the Residence and signed ATF Consent to Search Form 3220.11, documenting her consent to search the Residence. (Pol. Rep. ¶ 5; D.E. 40 Ex. A.)

any additional narcotics or firearms located within the Residence. (Pol. Rep. ¶ 9.) Defendant agreed to do so, after which S/A Sente read to Defendant ATF Advise of Rights and Waiver Form 3200.4, which described Defendant's rights under Miranda v. Arizona, 384 U.S. 436 (1966). (Pol. Rep. ¶ 9, D.E. 40 Ex. B.) Defendant subsequently signed the form. (Pol. Rep. ¶ 9, D.E. 40 Ex. B.) The form also bears S/A Sente's signature as a witness indicating that the form was signed at 8:56 AM. (D.E. 40 Ex. B.) After signing the form, Defendant directed the officers to additional cocaine, which was located next to the bed, and a .357 Rossi revolver bearing a defaced serial number (the "Firearm"), which was loaded with six rounds of ammunition and hidden in a tool bag located in the rear bedroom closet. (Pol. Rep. ¶ 9.)

According to the Government, upon seeing the Firearm, Defendant said "that's mine," after which S/A Sente gave Defendant the opportunity to sign a sworn statement attesting to that fact. (Pol. Rep. ¶ 9.) S/A Sente read ATF Affidavit Form 5000.1 to Defendant, on which Defendant subsequently drafted and signed a statement attesting to his ownership of the Firearm (the "Statement").[3] (Pol. Rep. ¶ 9.) The Statement also bears S/A Sente's signature as a witness and indicates that Defendant subscribed and swore the Statement to S/A Sente at 9:24 AM. (D.E. 40 Ex. C.)

By contrast, Defendant avers that "at the time the police entered [the rear bedroom he] was asleep and the door was closed." (D.E. 43 ("Deft.'s Aff.".) ¶ 4.) Defendant states that the investigators entered the room and claimed to have a "body warrant," but the investigators never

---

[3] The Statement reads: "Had the fire arms for 5 years never been in a shooting bought the fire arms for home protection didn't do the numbers off the fire arms it was already scratch or scrape off." (D.E. 40 Ex. C.)

4

showed him such a warrant. (Deft.'s Aff. ¶¶ 5–6.) Defendant further states that the officers began searching the room and ultimately found the Firearm. (Deft.'s Aff. ¶¶ 5, 7.)

According to Defendant, after the officers located the Firearm, they asked Defendant to write a statement admitting ownership of the weapon, and Defendant complied. (Deft.'s Aff. ¶ 7.) Defendant states that only after he provided the written statement did law enforcement provide him a form describing his Miranda rights, and that the officers did not read to him the Miranda rights prior to the asking him to write the Statement. (Deft.'s Aff. ¶ 8.)[4]

I. DISCUSSION

Evidentiary hearings are not required for pretrial motions as a matter of course. See Fed.R.Crim.P. 12(c). A defendant is entitled to a hearing for a motion to suppress if the motion is "sufficiently specific, non-conjectural, and detailed" to enable the court to conclude that it presents "a colorable constitutional claim" and "there are disputed issues of material fact that will affect the outcome" of the motion. United States v. Hines, 628 F.3d 101, 105 (3d Cir. 2010).

A. Motion to Suppress the Firearm

Defendant argues that evidence of the Firearm must be suppressed to remedy the constitutional violation committed in a warrantless search of the Residence on October 3, 2019. The Fourth Amendment prohibits unreasonable searches and seizures, and it is well-established that, in general, entry into a person's house without a warrant is "unreasonable per se." Payton v. New York, 445 U.S. 573, 586 (1980). Under the exclusionary rule created by the Supreme Court,

---

[4] Defendant's brief asserts that Defendant did not sign a consent to search until after the search was conducted. (D.E. 38 at 2.) However, Defendant's affidavit does not assert that he ever signed such a consent to search, and the only form before the Court that reflects a consent to search is that which was signed by James. (D.E. 40 Ex. A.)

5

any evidence seized in violation of a criminal defendant's Fourth Amendment rights must be excluded from trial. Alderman v. United States, 394 U.S. 165, 171 (1969); see also United States v. Franz, 772 F.3d 134, 145 (3d Cir. 2014) ("The exclusionary rule is a prudential doctrine designed to enforce the Fourth Amendment . . . by preventing the government from relying at trial on evidence obtained in violation of the Amendment's strictures.").[5]

Defendant challenges the search on the ground that the authorities searched the bedroom without a warrant, probable cause, or consent.[6] The Government acknowledges that the evidence of the Firearm was obtained in a warrantless search of the Residence but argues that the search of the Residence was justified by the consent freely given by James. Thus, the Government maintains, the search of the bedroom in which the Firearm was discovered was not unreasonable under the Fourth Amendment, and the Firearm should not be excluded as evidence in any trial against Defendant.

Defendant fails to point to any "disputed fact" that would "make a difference in the outcome" as to whether law enforcement had authority to search the bedroom in which the Firearm was located. Hines, 628 F.3d at 105. Defendant's affidavit submitted in support of his motion does not address the circumstances surrounding the consent to search the Residence that James'

---

[5] "A defendant must have standing to invoke the Fourth Amendment's exclusionary rule." United States v. Correa, 653 F.3d 187, 190 (3d Cir. 2011). A defendant has standing if he has a legitimate expectation of privacy in the invaded place. Id. The Government has not challenged Defendant's standing to bring this motion and the Court thus will assume standing exists.

[6] It is not clear on the face of Defendant's submission whether his argument concerns consent provided to the authorities by James or by himself. In any event, the Government concedes that Defendant did not consent to the investigators' search of the bedroom (D.E. 44 ("Gov't. Reply" at 3)) and thus the Court construes Defendant's challenge as one to the validity of the verbal and written consent that James provided to the investigators.

provided to the authorities and, even when construed in the light most favorable to Defendant, the affidavit does not change the Court's conclusion regarding the constitutionality of the search. Because Defendant has failed to show the existence of a material dispute of fact, the Court will resolve his motion as to the Firearm without further inquiry at an evidentiary hearing.

1. James had the authority to consent to the search and did so voluntarily.

The Fourth Amendment ensures "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Nonetheless, consent to a search is a well-recognized exception to the general requirements of both a warrant and probable cause. U.S. v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). "The individual giving consent must . . . possess the authority to do so," id. (citing Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)), and "[a]ctual authority for a third party to consent to an entry by police exists when the third party has common authority over a premise." Kirley v. Williams, 330 Fed. App'x. 16, 19 (3d Cir. 2009) (citing United States v. Matlock, 415 U.S. 164, 171 (1974)). While an overnight guest may have a reasonable expectation of privacy in his host's home, that host is generally understood to maintain the authority to license others—including law enforcement—into the home, as well. See Minnesota v. Olson, 495 U.S. 91, 99 (1990) ("From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone <u>but his host and those his host allows inside</u>.") (emphasis added); United States v. Wiest, 596 F.3d 906, 910 (8th Cir. 2010) (a "guest has no legitimate expectation that his possessions are private from the homeowner and those his host allows inside"); e.g., United States v. Fuller, 77 F. App'x 371, 377 (6th Cir. 2003) (consent to

search the room of an overnight guest validly obtained from lessee of the apartment); United States v. Hernandez-Rubio, No. 8:19-CR-389, 2020 WL 5217201, at *9 (D. Neb. Apr. 20, 2020), report and recommendation adopted, No. 8:19-CR-389, 2020 WL 3072040 (D. Neb. June 9, 2020) (third party had "common authority, joint access to, and control over the items and/or rooms being searched because this was her house and her bedroom"); United States v. Perdue, No. 1:19-CR-78, 2019 WL 3501523, at *8 (N.D. Ala. Aug. 1, 2019) (finding that the third party homeowner held "ultimate authority to consent" to the search of an overnight guest's bedroom). The Fourth Amendment is not violated if the police officer's entry is "based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not do so." Rodriguez, 497 U.S. at 179, 188–89; United States v. Murray, 821 F.3d 386, 391–92 (3d Cir. 2016).

The consent to search the premises also must be granted voluntarily, which can be assessed based on a range of factors. Id. Whether an individual has given voluntary consent "is a question of fact to be determined from the totality of all of the circumstances." United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003) (quoting Schneckloth, 412 U.S. at 227); see also United States v. Crandell, 554 F.3d 79, 88 (3d Cir. 2009) ("Consent to a search is determined by examining all the circumstances . . .."). The Third Circuit has identified several "critical factors" to be considered in a totality of the circumstances inquiry: "[T]he setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual." Givan, 320 F.3d at 459. It has also held that officers are not required to advise citizens that they may refuse to consent. Crandell, 554 F.3d at 88 (citing United States v. Drayton, 536 U.S. 194, 206-07 (2002)).

It is uncontested that James lived at and owned the Residence, and that Defendant was present at the Residence with the permission of James. Nor are there facts to suggest that Defendant had dominion over the rear bedroom to the exclusion of James.[7] Given this, the Court concludes that James, as the homeowner, had common authority over the rear bedroom and was able to validly consent to its search, as she did without limitation. Even assuming, arguendo, that James did not have actual authority to permit a search of the rear bedroom, law enforcement could reasonably conclude that she had the apparent authority to do so—notwithstanding the presence of other individuals at the Residence, Individual 1 conveyed to S/A Sheridan that James owned the Residence and could grant consent to search the same.

Defendant has not submitted any evidence that would support a contention that James' consent to search was not voluntary. According to the police report, James' verbal consent to search the Residence was provided remotely and after S/A Sheridan's explanation of the purpose of their search. James was asked to provide her consent, and there is no indication that she did so by coercion or threat. After having some unknown amount of time to reconsider her consent while she returned to the Residence, she received and reviewed ATF Form 3220.11 which advised James of, among other things, her rights to refuse to give consent and to revoke that consent. Armed with this information, James signature to the document served to reinforce and adopt her earlier, verbal consent. Indeed, the fact that James did not submit any affidavit or other submission controverting

---

[7] The record does not contain information regarding James' use of the rear bedroom, and it is ambiguous whether she regularly slept or otherwise used the room. (See Pol. Rep. ¶ 5 ("[Defendant stated that] he . . . stayed with JAMES in the rear bedroom."), (Deft.'s Aff. ¶ 4) ("I was the sole occupant of the bedroom . . ..").) While a showing that James regularly accessed the rear bedroom would erase any doubt regarding her ability to consent to its search, it is not necessary to the Court's conclusion that she had the authority to do so.

the police's account of her consent highlights the lack of any basis for contesting the validity of that consent.

2. Defendant did not object to the search

Notwithstanding James' consent, the Government concedes that law enforcement would have been required to cease its search of the rear bedroom if Defendant had objected to it. (D.E. 40 at 7.) There are limits to what a non-present third party can consent to, and police cannot search a home based on that consent when an on-site resident "expressly refuses" to consent to the search. Georgia v. Randolph, 547 U.S. 103, 121 (2006). The Supreme Court has subsequently underscored that Randolph represents a "narrow exception" to the rule that "police officers may search jointly occupied premises if one of the occupants consents." Fernandez v. California, 571 U.S. 292, 294 (2014). Given the Randolph Court's emphasis that the objection must be "express" and "clear"[8] and Fernandez's instruction that Randolph must be read narrowly, nothing short of an unambiguous refusal to consent to a search will suffice to override a third party's validly given consent.[9]

---

[8] See 547 U.S at 106 ("[T]he question here is whether such an evidentiary seizure is likewise lawful with the permission of one occupant when the other . . . is present at the scene and expressly refuses to consent."); id. at 114 ("There is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another"); id. at 119 ("[T]he question in this case . . . [is] whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent."); id. at 120 ("We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable . . . ."); id. at 121–122 ("[T]here is practical value in the simple clarity . . . of according dispositive weight to the fellow occupant's contrary indication when he expresses it."); id. at 122–123 ("This case invites a straightforward application of the rule that a physically present inhabitant's express refusal of consent . . . ."); id. at 123 (referring to respondent's refusal to consent to the search as "clear") (all emphases added).

[9] An express revocation of consent must be made prior to or during the search to be effective. United States v. Stabile, No. 08-145 (SRC), 2009 WL 8641715, at *8 (D.N.J. Jan. 21, 2009), aff'd, 633

With this framework in mind, and accepting Defendant's version of events as true, the Court concludes that Defendant acquiesced without objection to law enforcement's search, at best. Defendant's failure to open the door to the rear bedroom for several minutes, without more, is insufficient to evidence an "express refusal" to consent to a search. Cf. United States v. Wilmore, 57 Fed. App'x. 949, 953 (3d Cir. 2003) ("A consent that waives Fourth Amendment rights may be . . . withdrawn by an unequivocal act or statement that clearly expresses the individual's desire not to be searched."); United States v. Moore, 770 F.3d 809, 814 (9th Cir. 2014) ("Acquiescence in a co-occupant's consent and police officers' subsequent actions is insufficient to satisfy the narrow exception set forth in Randolph."). Interpreting Defendant's silence in the locked bedroom as an express refusal of consent would "needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field" and would cause every co-tenant consent case "to turn into a test about the adequacy of the police's efforts to consult with a potential objector." Randolph, 547 U.S. at 122. It was incumbent upon Defendant to take affirmative action to expressly object to law enforcement's search; he did not do so. Compare Est. of Vargas v. Cty. of Hudson, No. CV 14-1048, 2020 WL 3481774, at *7 (D.N.J. June 26, 2020) (finding that an onsite resident expressly objected to a search where he never gave verbal consent to enter his trailer and where every time law enforcement unlocked the door, the resident locked it again from the inside).[10]

---

F.3d 219 (3d Cir. 2011) ("Although Stabile revoked consent, by the time he did so, the hard drives had been seized and removed from the premises").

[10]  Under an alternative reading of Defendant's affidavit, he was asleep at the moment law enforcement entered the room. This reading fails to change the Court's conclusion: Whether he was asleep or merely silent when the investigators began its search, he has failed to indicate that he objected in any manner to the search. See, e.g., Rodriguez, 497 U.S. at 181 (finding valid a search based on the consent of an absent but apparent co-tenant, where defendant was asleep in the apartment).

It is of no moment whether the investigators purported to have a "body warrant" upon entering the rear bedroom, as Defendant claims. They were not obligated to inform Defendant of his right to revoke James' consent as an on-site objector. Indeed, "[t]he [Schneckloth] Court explicitly considered—and rejected—the possibility of mandating Miranda-like warnings for all consensual searches." United States v. Price, 558 F.3d 270, 279 (3d Cir. 2009) (citing Schneckloth, 412 U.S. at 227, 231) (internal citations omitted). Given that investigators are under no obligation to inform an individual of his rights prior to seeking his consent to search, it would make little sense to require investigators—already armed with validly given consent—to apprise potential objectors of theirs.

Accordingly, there is no indication that Defendant expressly objected to the search. As there is no dispute of material fact with respect to the motion to suppress evidence of the Firearm, and because the authorities performed a valid search of the rear bedroom with James' consent, Defendant's motion to suppress evidence of the Firearm is denied.

### B. Motion to Suppress the Statement

Defendant also moves to suppress evidence of the Statement, asserting that it was furnished in violation of his Miranda rights. In support of that motion, Defendant avers that after the authorities seized the Firearm, they requested that Defendant write a statement admitting his ownership of the weapon, and he complied with the request. (Deft.'s Aff. ¶ 7.) According to Defendant, the authorities did not read him his rights prior to asking him to write the Statement and it was only after he drafted the Statement that the authorities provide him a form describing for Defendant his Miranda rights. (Deft.'s Aff. ¶ 8.)

The Government concedes that Defendant's version of event presents a dispute over a material fact—namely, whether Defendant was advised of his Miranda rights prior to providing this statement to law enforcement—but argues that the Court should rely on the documentary evidence to conclude that Defendant's challenge should fail. The Government directs the Court's attention to the ATF forms signed by Defendant, which purportedly demonstrate that Defendant was advised of his Miranda rights approximately 30 minutes before he wrote the Statement. This, the Government claims, conclusively demonstrates that Defendant was, in fact, read his Miranda rights prior to writing the Statement and that the Court should dispose of Defendant's challenge without an evidentiary hearing.

The Court disagrees. Notwithstanding the existence of documentary evidence asserting contrary facts, Defendant's affidavit is "sufficiently specific, non-conjectural, and detailed" to enable the Court to conclude that Defendant presents "a colorable constitutional claim." Hines, 628 F.3d 101, 105 (3d Cir. 2010). Accordingly, the Court will hold an evidentiary hearing limited to the facts in dispute relevant to Defendant's motion to suppress the evidence of the Statement.

## II. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence of the Firearm is denied and an evidentiary hearing will be held concerning the circumstances surrounding the Statement. The Court will file an appropriate Order.

   s/ Stanley R. Chesler   <br>
STANLEY R. CHESLER<br>
United States District Judge

Dated: May 19, 2021